**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Nickolas Smith,<br><br>individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>           v.<br><br>Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, Kalshi Trading LLC, Susquehanna International Group, LLP and Susquehanna Government Products LLLP and Robinhood Derivatives LLC,<br><br>    Defendants. | C.A. 1:26-cv-12413-FDS |

## AMENDED CLASS ACTION COMPLAINT

1.　　Plaintiff, Nickolas Smith ("Plaintiff' or "Smith"), by and through his attorneys, individually and on behalf of all others similarly situated, files this Class Action Complaint against Defendants Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC and Kalshi Trading LLC (together, "Kalshi"), Susquehanna International Group, LLP and Susquehanna Government Products, LLLP (the "Susquehanna Defendants"), and Robinhood Derivatives LLC ("Robinhood") (collectively, "Defendants") and alleges as follows:

### Preliminary Statement

2.　　This is a class action arising from Defendants' offering unlicensed sports wagering to Massachusetts residents. By operating unlicensed sports betting, Defendants have violated the Massachusetts gambling and consumer protection laws and unjustly enriched themselves at the expense of thousands of Massachusetts consumers who lost substantial sums of money wagering on future events on Defendants' mobile apps and websites. Accordingly, Plaintiff, on behalf of himself and Classes (defined below) of similarly situated individuals, brings this lawsuit to recover

the losses on his and their wagers and disgorgement of Kalshi's transaction fees, deposit and withdrawal fees, and profits, together with treble damages, injunctive relief, interest, costs and reasonable attorneys' fees.

3.      Plaintiff Smith is a Massachusetts resident who, like the other members of the Classes, placed sports wagers through Kalshi. Plaintiff did this in two ways. First, as a customer of Robinhood, he accessed Robinhood's "prediction markets hub," through which he placed sports event contract trade orders through Kalshi. Second, he also signed up for and used Kalshi's online platform to place sports event contract trade orders.

4.      Using both Robinhood's and Kalshi's websites and mobile apps, Smith and the Classes purchased either "yes" or "no" positions on "event contracts," including the outcome of sporting events. When Smith and the Class Members chose the incorrect position, they lost money. The Massachusetts Sports Wagering Law defines sports wagering as: "the business of accepting wagers on sporting events or portions of sporting events," while "wager" is defined as "a sum of money or thing of value risked on an uncertain occurrence." Mass. Gen. Laws c. 23N, § 3. Smith and the Classes thus lost substantial sums of money placing sports wagers through Kalshi.

5.      Kalshi's platform markets so-called "event contracts" but, in practice, functions as an online sportsbook offering sports betting. Through the Kalshi platform, Massachusetts residents fund accounts with real money, place wagers on the outcomes of sporting events by buying "Yes" or "No" positions and receive cash payouts when their wagers win. In substance, users: deposit money → bet on a sports outcome → win/lose → withdraw cash if they win and lose the money they bet if they lose. In practice, Kalshi both creates a forum for participants to bet against other users and to bet against Kalshi itself or its affiliated and institutional market-making counterparties, including Defendant Kalshi Trading LLC and the Susquehanna Defendants, which stand ready to take the opposite side of public wagers as a business. Kalshi grants these

counterparties financial incentives, fee discounts, and technological trading advantages that are not available to ordinary retail users.

6.  Kalshi attempts to evade Massachusetts' gambling laws by recasting sports wagers as federally regulated "derivatives" traded on a so-called "prediction market." Kalshi avers that users are not betting on sporting events but are instead buying and selling what Kalshi calls "futures", "swaps", or "options" on event outcomes—a characterization aimed at regulators and courts, not ordinary users. In reality, Kalshi's framing of its offerings as derivatives is illusory: users pay real money, select a side of a sporting event, and either lose their stake or receive a fixed cash payout based entirely on the win-loss result of the game. Kalshi monetizes this sports-wagering activity by charging transaction fees tied to user bets and by structuring its platform, which enables users to bet against other users and against Kalshi and affiliated market makers, to generate revenue from wagering volume. The "prediction market" structure is thus a pretext designed to disguise sports betting as financial trading. In substance and effect, Kalshi operates an unlicensed online sportsbook in Massachusetts, in violation of Massachusetts law.

7.  The Massachusetts Attorney General recently brought litigation against Kalshi for violating the Massachusetts Sports Wagering Law by offering sports wagering to Massachusetts residents, even though Kalshi does not have a Massachusetts gaming license. *See Massachusetts v. Kalshi, LLC*, No. 2584CV02525 (Super. Ct.). On the Commonwealth's motion for preliminary injunction, the Massachusetts Superior Court ruled that the Commonwealth could enforce its Sports Wagering Law against Kalshi and that the Commonwealth was likely to succeed on its claim that Kalshi could not take sports wagers in Massachusetts without a license from the Massachusetts Gaming Commission ("MGC"). The Court also found that the Commonwealth was likely to prevail on its claim that Kalshi was violating the Massachusetts Sports Wagering Law. The Court noted that: "Kalshi does not argue that its sports-related event contracts do not meet the

definition of sports wagering in the Commonwealth. Neither does it challenge the Commonwealth's assertion that it is operating in Massachusetts without a license." Memorandum of Decision and Order on Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss. (Dkt. No. 47 at 7.) Accordingly, the Court entered a preliminary injunction against Kalshi. That injunction has been stayed pending appeal before the Supreme Judicial Court. Other courts across the country have issued similar injunctions against Kalshi.

8.      In its Complaint in *Massachusetts v. Kalshi, LLC*, No. 2584CV02525 (Super. Ct.), Massachusetts also explicitly referred to Defendant Robinhood and its contractual relationship with Kalshi, alleging that "[t]he availability of Kalshi's contracts are not limited to Kalshi's platform, but are also available on Robinhood, a stock-trading platform accessible via app and webpage." (Dkt. No. 1 ¶ 129.) Massachusetts further alleged that "[a]pproximately $1 billion worth of Kalshi wagers were traded on Robinhood during the second quarter of [2025], which likely generated an estimated $10 million in revenue for Kalshi." (*Id.* ¶ 130.) Because Robinhood has partnered with Kalshi to offer Kalshi's prediction market on Robinhood's own platform, Robinhood also violates Massachusetts law by offering sports wagers without a license.

9.      Defendants' engaging in sports wagering without a license from the MGC is in direct violation of Mass. Gen. Laws c. 23N. As the Court in *Massachusetts v. Kalshi* explained:

> A licensed sports wagering operator in Massachusetts is subject to several obligations under the statutory and regulatory framework, including: 1) implementing responsible gambling features; 2) reporting suspected illegal activity: 3) preventing certain individuals from wagering on sporting events, including those related to the event and the sports wagering operator; 4) preventing underage sports wagering through the use of electronic age and identity verification; 5) offering users betting limits, as well as employing other methods to promote responsible gaming; and 6) complying with the Massachusetts volunta1y self-exclusion program, which allows gamers to exclude themselves from casino gambling and sports wagering. See G.L. c. 23N, §§ 4(d)(2), 11, 13(d); 205 Code Mass. Regs.§§ 248. 16, 256.07. Kalshi has not applied for a Massachusetts sports wagering license, and is not licensed in the state to offer sports wagering.

(Dkt. No. 47 at 6.)

4

10.     Defendants' unlawful conduct has caused substantial harm to Massachusetts consumers such as Plaintiff, both in terms of the economic losses they suffered on their sports wagers, as well as the various other serious harms associated with online gambling. As a remedy for Defendants' illegal conduct, Plaintiff Smith and the Classes seek to recover, at a minimum, all losses they suffered by placing sports wagers on Defendants' platforms and disgorgement of Kalshi's transaction fees, deposit and withdrawal fees, and profits pursuant to the Massachusetts "Statute of Anne" discussed below, M. G.L. c. 93A, and on a theory of unjust enrichment. Plaintiff Smith and the Classes also seek injunctive relief requiring that Defendants cease offering sports wagers in Massachusetts without a license from the MGC.

Parties

11.     Plaintiff Nickolas Smith is an individual residing in Raynham, Massachusetts. He placed sports wagers through Kalshi first through Robinhood, and then through Kalshi's online platform. Between January 25, 2026 and February 23, 2026, he lost tens of thousands of dollars placing sports wagers on Kalshi's mobile app and website. Smith struggles with gambling addiction, as a result of which he voluntarily excluded himself from betting in various casinos and through online sports betting platforms. Because Defendants did not offer him the same type of voluntary self-exclusion, however, particularly through Robinhood, Smith succumbed and placed sports wagers through Robinhood and then Kalshi.

12.     Defendant Kalshi Inc. is a Delaware corporation with its principal place of business and headquarters located in New York, New York. Kalshi Inc. is the parent company of the Kalshi entities, including Defendants KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, and Kalshi Trading LLC. Through these subsidiaries and affiliates, Kalshi Inc. owns, controls and operates the Kalshi platform, an online sportsbook through which individuals, while located in Massachusetts, can place wagers on the outcome of sporting events. Kalshi Inc. also owns a trading

arm (Defendant Kalshi Trading LLC) that participates in the Kalshi platform. Kalshi monetizes wagering activity on the platform by charging transaction fees assessed in connection with user wagers/transactions regardless of whether the user wins or loses, thereby profiting from wagering activity. Through its ownership, control, and direction of the Kalshi platform and its subsidiaries, and by profiting from wagers placed by members of the public, Kalshi Inc. promotes and profits from unlicensed and unlawful gambling in Massachusetts.

13.    Defendant KalshiEX LLC ("KalshiEX") is a Delaware limited liability company with its principal place of business in New York, New York. KalshiEX is a wholly owned subsidiary of Kalshi Inc. KalshiEX operates a so-called "prediction market" through which residents of the Commonwealth can engage in unlicensed gambling under the guise of trading "event contracts." This market is an online trading platform through which users may wager on the likelihood of a sports-related occurrence. KalshiEX conducts business across the United States, including in the Commonwealth of Massachusetts, where KalshiEX makes its services available to residents, markets its platform to potential users, and accepts payments (including transaction fees) through widely used financial systems accessible by Massachusetts consumers, including Plaintiff and the Classes.

14.    Defendant Kalshi Klear Inc. is a Delaware corporation with its principal place of business and headquarters located in New York, New York. Kalshi Klear Inc. is the parent company of Kalshi Klear LLC and exists to support the clearing, settlement, and payout functions of the Kalshi platform, including for Massachusetts residents.

15.    Defendant Kalshi Klear LLC is a Delaware limited liability company with its principal place of business and headquarters located in New York, New York. Kalshi Klear LLC is a wholly owned subsidiary of Kalshi Inc. through Kalshi Klear Inc. and is affiliated with KalshiEX and Kalshi Trading LLC. Kalshi Klear LLC provides clearing, settlement, and payout

functions used by the Kalshi platform to resolve sports wagers and distribute winnings to users, including Massachusetts residents. Kalshi markets Kalshi Klear as a component that "accelerates" the platform, including by enabling faster settlement and payout of wagers and supporting the expansion of sports-based wagering offerings.

16.    Defendant Kalshi Trading LLC ("Kalshi Trading") is a Delaware limited liability company with its principal place of business and headquarters in New York, New York. Kalshi Trading is a wholly owned subsidiary of Kalshi Inc. and acts as an in-house institutional counterparty on the Kalshi platform by routinely taking positions opposite those taken by users placing sports wagers, including users located in Massachusetts. By standing ready to accept and consistently taking the other side of public wagers as a regular business practice, Kalshi Trading provides continuous liquidity and enables sports wagers to be placed and settled at scale. In doing so, Kalshi Trading accepts bets from members of the public as a business, participates in the proceeds of those wagers, and becomes entitled to receive money or other things of value when users' wagers lose. In substance and effect, Kalshi Trading operates as part of the wagering "house," enabling, sustaining, and profiting from the sports-wagering enterprise conducted through the Kalshi platform. Through this conduct, Kalshi Trading engages in bookmaking and functions as a bookmaker by unlawfully accepting sports bets from members of the public, including Massachusetts residents, upon the outcomes of future contingent sporting events.

17.    Defendant Susquehanna International Group LLP is a Delaware limited liability partnership with its principal place of business and headquarters located in Bala Cynwyd, Pennsylvania. Susquehanna International Group LLP is the parent company of all Susquehanna entities. Susquehanna is one of the largest proprietary trading firms and market-making firms in the world. As relevant here, Susquehanna serves as an institutional counterparty for Kalshi on the

Kalshi platform, routinely taking positions opposite retail users' sports wagers, including wagers placed by Massachusetts residents.

18.    Defendant Susquehanna Government Products, LLLP is a Delaware limited liability limited partnership with its principal place of business and headquarters located in Bala Cynwyd, Pennsylvania. Susquehanna Government Products, LLLP is a member of the Susquehanna International Group of Companies. As announced on April 3, 2024, Susquehanna Government Products, LLLP became Kalshi's first dedicated institutional market maker on the Kalshi platform. Susquehanna Government Products, LLLP serves as an institutional market maker for Kalshi, creating, buying, and selling event contracts on the Kalshi platform. Kalshi obtains significant liquidity through its partnership with Susquehanna Government Products, which routinely takes the opposite side of retail users' trades, thereby helping to ensure that there are always buyers and sellers available. In substance and effect, Susquehanna accepts sports wagers from members of the public, including from Massachusetts residents, and profits from wagering activity conducted on the Kalshi platform.

19.    Defendant Robinhood Derivatives LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois. It is one of the family of companies within the broader Robinhood organization. Robinhood is a "futures commission merchant," which is an entity that solicits or accepts orders to buy or sell futures and swaps and accepts payment from customers to support such orders. Robinhood has partnered with Kalshi to offer a "prediction market hub," allowing Massachusetts residents, including Plaintiff and the Classes, to place illegal, unregulated sports wagers in the form of sports event contracts.

20.    Plaintiff is informed and believes, and on that basis alleges, that each Defendant acted in concert with, and/or under the direction and control of, the other Defendants in connection with the conduct alleged herein, and that the acts of each were authorized, directed, ratified, and

undertaken for the benefit of the others. Plaintiff is further informed and believes, and on that basis alleges, that Kalshi Inc. owns and controls KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, and Kalshi Trading LLC, and that these entities operate as part of a single, integrated business enterprise with centralized control over the Kalshi platform. On information and belief, Kalshi Inc. and its Kalshi subsidiaries share common officers and managers, coordinate operations and personnel, and share systems and infrastructure used to operate, clear, settle, and monetize wagering activity on the Kalshi platform. To the extent applicable, the Kalshi entities function as alter egos and instrumentalities of one another with respect to the wagering enterprise described herein. Treating these Kalshi entities as wholly separate for purposes of the conduct at issue would promote injustice, elevate form over substance, and permit Defendants to avoid accountability for the integrated, unlawful operation of the Kalshi platform.

## Jurisdiction

21.    Defendants have invoked this Court's jurisdiction and asserted the existence of subject matter jurisdiction through their Notices of Removal, Doc. Nos. 1 and 13, pursuant to 28 U.S.C. §§ 1331, 1332, 1332(d) and 1442(a)(2).

## Factual Allegations

### *Massachusetts Laws and Regulation Governing Gambling*

#### **Massachusetts Laws and Regulations regarding Gambling**

22.    The Commonwealth of Massachusetts comprehensively regulates gambling related activities within its borders. *See, e.g.*, M.G.L. c. 271; *Gattiner v. Jifynn MA, LLC,* 493 Mass. 13, 20 (2023) (citing *Abdaw v. Ati'y Gen.,* 468 Mass. 478, 489-90 (2014)) (the SJC "has long recognized that the legalization and regulation of gambling are among the Legislature's core police powers….").

23. With few exceptions, Chapter 271 of Massachusetts General Laws criminalizes gambling activities as crimes against public policy. Since the early-twentieth century, Chapter 271 has comprised "a complete and comprehensive statutory system designed to eliminate the evil of gambling...." *Commonwealth v. Wolbarst,* 319 Mass. 291, 295 (1946).

24. The legislature defines "illegal gaming" as "a banking or percentage game played with cards, dice, tiles, dominoes, or an electronic or mechanical device or machine for money, property, checks, credit or any representative of value," unless otherwise authorized as legal gambling which includes, in pertinent part, "sports wagering conducted under chapter 23N." M.G.L. c. 4, § 7, cl. 10.

25. Until the overturning of the Professional and Amateur Sports Protection Act ("PASPA," 28 U.S.C. § 3701, *et seq.*) in 2018, sports wagering was illegal in most of the United States. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). Since then, numerous states and territories have legalized sports betting.

26. Sports wagering became legal in the Commonwealth in 2022. St. 2022, c. 173. Eligibility to accept sports wagers is conditioned on state licensure, which is governed by the MGC; and, once licensed, gaming operators are strictly regulated by the MGC. *See* G.L. c. 23N, 205 CMR§§ 202-258 (the "Sports Wagering Regulations").

27. Sports wagering is regulated for many good reasons, among them that such wagering has significant public health consequences, such as compulsive gambling – a clinically recognized behavioral addiction – and disastrous financial losses.

28. Massachusetts has established a legal process requiring a license to offer sports wagering, including through the internet and mobile devices. M.G.L. c. 23N, § 5.

29. Pursuant to that process, the MGC established a licensing regime. *Id.* Any operator providing sports wagering in Massachusetts must be licensed by the MGC and is subject to

stringent requirements to protect the public, including without limitation verifying gamblers' location and age, *see* 205 CMR § 243.01(1)(i) (location), 205 CMR § 248.04 (age); committing to responsible gambling initiatives (such as allowing the patron to set self-imposed limitations on sports wagering at any time), *see, e.g.,* 205 CMR § 248.16; financial and other reporting, *see, e.g.,* 205 CMR § 239.03; reporting suspicious or illegal wagering activity, *see* M.G.L. c. 23N, § 11(e); and reserve requirements to secure payouts to winners, *see* 205 CMR § 238.12.

30.    General Laws Chapter 23N, § 3 defines "sports wagering" as "the business of accepting wagers on sporting events or portions of sporting events, other events, the individual performance statistics of athletes in a sporting event or other events or a combination of any of the same.... Sports wagering shall include, but shall not be limited to, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange wagering, in-game wagering, in-play bets, proposition bets and straight bets."

31.    "Wager" is defined as "a sum of money or thing of value risked on an uncertain occurrence." M. G.L. c. 23N, § 3.

32.    A "sports event" or "sporting event" is defined as "a professional sport or athletic event, collegiate sport or athletic event, a collegiate tournament ... or other event authorized by the" MGC. M.G.L. c. 23N, § 3. Wagering is statutorily prohibited on "high school and youth sports or athletic events; or a collegiate sport or athletic event involving 1 or more collegiate teams from the commonwealth unless they are involved in a collegiate tournament" insofar as they are statutorily excluded from the definition of a "sporting event." M.G.L. c. 23N, § 3.

33.    Chapter 23N provides that "[n]otwithstanding any general or special law to the contrary, the operation of sports wagering and ancillary activities shall be lawful when conducted" pursuant to Chapter 23N and the Sports Wagering Regulations. M.G.L. c. 23N, § 2. Nevertheless, "[a] person shall not engage in any activity in connection with sports wagering in the

11

commonwealth unless all required licenses have been obtained in accordance with this chapter and the rules and regulations of the commission." M.G.L. c. 23N, § 5(a).

### Sports Wagering Licensure and its Obligations

34. To qualify for a sports wagering license, the applicant must undergo an extensive investigation for "suitability" to determine that "each person who has control of the applicant meets all qualifications for licensure." M.G.L. c. 23N, §§ 5(b), 6(d); *see, e.g.*, 205 CMR § 215.00. The MGC's suitability analysis considers, *inter alia*, the applicant's reputation, financial stability and resources, business acumen, history of compliance with gambling requirements in other jurisdictions, litigation status and the suitability of its affiliates and associates. M.G.L. c. 23N, § 6(d).

35. Not only are sports wagering operators rigorously vetted for licensure, but the MGC also licenses vendors and affiliates of the operators. 205 CMR § 234.0l(l)(a). The MGC conducts a similar "suitability" investigation centered on integrity and financial stability before issuing any vendor license. *See generally* 205 CMR § 234.00.

36. As noted, a sports wagering licensee owes numerous duties under Massachusetts law, including but not limited to prohibiting youth and self-excluded individuals from receiving both its products and advertisements, implementing other responsible gambling features and reporting suspected illegal activity or activity that compromises the integrity or betting outcome of a sporting event.

37. Massachusetts restricts sports wagering to those over 21 years old, M.G.L. c. 23N, § 13(d), and extensive MGC regulations require operators to implement specific protections for youth under the age of 21 from sports wagering. *See, e.g.,* 205 CMR § 250.00.

12

38.    A licensed sports wagering operator must employ electronic verification to confirm the identity and age of a user before he or she can create an account, 205 CMR § 248.04, and must limit users to a single account, 205 CMR § 248.05(1).

39.    Licensed sports wagering operators must promote "social responsibility and responsible gaming." M.G.L. c. 23N, § 4(d)(2). They must "assess, prevent and address problem gaming by an operator's consumers," such as via "comprehensive employee trainings on responding to circumstances in which individuals present signs of gambling addiction." *Id.*

40.    Operators must offer daily, weekly, and monthly deposit and wager limits that specify the maximum amount of funds that a patron may deposit into their sports wagering account or put at risk during a particular time frame, respectively. *See* 205 CMR § 248.16(1). A sports wagering operator must allow users to set betting limitations at any time, and prompt users to do so when creating an account, the first time a deposit is made, and the first time a wager is placed. *Id*

41.    When an individual enrolls in a Voluntary Self-Exclusion Program, a sports wagering operator must not advertise to that enrollee, 205 CMR § 256.07, or allow the enrollee to hold a sports wagering account during the exclusion period, 205 CMR § 233.02(1).

42.    All marketing, advertising, and promotional materials for sports wagering operators must include contact information for the Massachusetts Problem Gambling Helpline and any other responsible gambling information required by the MGC for the specific means of advertising used. *See* 205 CMR § 256.06.

43.    Licensees must immediately report to the MGC – and where applicable, the respective sport's governing body – information that includes abnormal betting activity that may compromise the integrity of a sporting event or its betting outcome (*e.g.,* match fixing). M.G.L. c. 23N, § 11(e); *see also* 205 CMR § 239.00.

44.     Licensees may only offer the specific types of sports wagers that are authorized by the MGC. 205 CMR § 247.01(1).

45.     A licensee's offerings may be limited by request of a sports governing body or associated players association upon a good cause showing that a type, form, or category of wager is "contrary to public policy," "unfair to patrons … or [a]ffects the integrity of the Sports Governing Body, Sporting Events of the Sports Governing Body, or the integrity, health or welfare of the athletes participating therein or that of their families." 205 CMR § 247.04(l).

46.     Moreover, operators must immediately report to the MGC any information concerning criminal proceedings commenced against it regarding its operations, as well as any other "suspicious or illegal wagering activity," such as funds derived from illegal activity or used to conceal or launder funds. *See* M.G.L c. 23N, § 11(e).

47.     The MGC's website currently lists only ten operators licensed to accept sports wagers in the Commonwealth.[1] Kalshi is not one of them.

48.     Kalshi has never sought approval or licensure from the MGC to engage in sports wagering in Massachusetts.

49.     Kalshi has failed to make any effort to demonstrate to the MGC that it meets the requirements for a license to engage in sports wagering in Massachusetts.

### Massachusetts Statute of Anne – M.G.L. c. 137, § 1.

50.     In addition to the Sports Wagering Law and Regulations described above, Massachusetts also has M.G.L. 137, § 1, which is sometimes called a "Statute of Anne." This law, based on a 1710 British law passed during the reign of Queen Anne, makes certain gambling debts

---

[1]     https://massgaming.com/about/sports-wagering-in-massachusetts/sports-wagering-licensees/ (last visited March 25, 2026)

unenforceable. It allows a losing party to sue a winning party (or owner of a gambling house) for the value of his or her losses.

51.     The Massachusetts Statute of Anne specifically provides as follows:

Whoever, by playing at cards, dice or other game, ... except for gaming conducted in licensed gaming establishments pursuant to chapter 23K or sports wagering conducted pursuant to chapter 23N, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner ... may recover such money or the value of such goods.

M.G.L. 137, § 1.

52.     The Massachusetts Statute of Anne further provides that:

The owner… of a house…, but not including an owner or operator of a gaming establishment licensed… where money or goods are lost, paid or delivered in any form of gaming referred to in the preceding section…, with the knowledge or consent of said owner… shall be liable in the same manner and to the same extent as the winner or receiver thereof is liable under the preceding section.

M.G.L. c. 137, § 2.

53.     Defendants are violating the Commonwealth's gambling laws, including its sports wagering laws and regulations, by offering unlicensed sports wagering to Massachusetts residents. Plaintiff thus brings this action, on behalf of himself and others similarly situated, to recover Defendants' ill-gotten gains, both pursuant to Massachusetts Statute of Anne and on a theory of unjust enrichment.

### Kalshi's "Prediction Market" Platform

54.     Kalshi attempts to disguise its sports wagering offerings by calling them "event contracts" offered on its internet-based "prediction market." An event contract is, in essence, a contract that pays out if a future event does, or does not, occur. Prediction markets allow for the purchase and sale of such event contracts.

55.     Founded in 2018, Kalshi operates one of the largest prediction markets in the United States.

15

56.     From inception, Kalshi has promoted itself as a novel "financial exchange" through which people could "trade in the domain of every day."[2]

57.     In reality, however, Kalshi was designed from the outset to appeal to mass-market speculation.

58.     When Kalshi first launched its platform publicly in July 2021, its event contracts focused on topics such as economic indicators (e.g., inflation) or weather (e.g., snowfall). These initial offerings were framed in financial terms, but structured and priced like bets. Each contract allowed users to take a position for or against a particular outcome for a fixed return.

59.     In October 2024, Kalshi expanded into political event contracts. Users were invited to bet on topics such as the outcomes of individual Senate races, which state would be the tipping point in the presidential election, which presidential candidates would win individual swing states, and the margin of victory in the race for the White House. The mechanics of these political event contracts (binary outcomes, fixed payouts, speculative pricing) are the same as those that would later comprise its sporting event contracts.

60.     In January 2025, Kalshi began to offer sports wagering contracts on its platform. As reported in 2025, "[m]ore than three-quarters of Kalshi's trading volume now comes from sports… The figures suggest that Kalshi makes a larger percentage of its money from sports than DraftKings or FanDuel-businesses that are almost synonymous with sports betting in the U.S."[3] Bettors have wagered well over $1 billion on sports wagers using Kalshi's platform. Kalshi has rapidly grown to more than five million active users and is valued at more than $20 billion.

---

[2] https://kalshi.com/about (last visited March 25, 2026).
[3] https://www.ingame.com/kalshi-sports-data-trading-volume/ (last visited March 25, 2026).

61.     Kalshi allows consumers, including consumers in Massachusetts such as Plaintiff and the Classes, to place bets, including sports bets, on its platform through its website, https://kalshi.com, and through its mobile application ("app") on the Android and iOS (Apple) platforms.

62.     Kalshi's sports wagering contracts are also available on Robinhood, a stock-trading platform accessible via app and webpage. The two platforms have partnered since March of 2025 to offer Kalshi wagers, with Robinhood driving a significant portion of Kalshi's total trading volume.

63.     The types of sports wager contracts that Kalshi offers are numerous, and Kashi continues to add more. Examples include who will be the Men's College Basketball Champion, whether Real Madrid or Bayern Munich will win an upcoming Champions League match or who will be the Pro Baseball Home Runs Leader this season. Kalshi's offerings also include bets on events such as the number of touchdowns a given player will score in a football game, how many points a certain team will win by, the overall total score in a game, and various bets on combinations of different sports outcomes.

64.     Kalshi's wagers allow a bet on whether such sports-related occurrences will happen. The bettor wins money if they guess correctly and forfeits the wagered cash if they bet incorrectly. In each case, the bettor's return is determined entirely by an outcome outside their control.

65.     Kalshi's sports wager contracts share a common form. For each, Kalshi poses a question about some definite future event. For example, Kalshi may ask whether the Seattle Mariners will be the AL West Division Winner. It then presents users with two options: "Yes" or "No." Users can buy either option at some variable price (set by market forces), ranging from $0.01 to $0.99. Then, the parties wait for an answer to the question (in the example above, whether

the Mariners become the AL West Division Winner). If the Mariners win the division, then Kalshi will pay the bettors who voted "Yes" the fixed value of the contract, while the bettors who betted "No" will lose the money wagered. If the Mariners do not win the division, Kalshi will pay the bettors who voted "No" the fixed value of the contract, and the bettors who voted "Yes" will lose the money wagered.

66.     Kalshi describes itself as a prediction market because each contract's price (ranging from $0.01 to $0.99) is determined based on the total volume of "Yes" and "No" wagers purchased, reflecting "the collective sentiment of its users regarding the likelihood of an event…"[4]

67.     Kalshi claims this "dynamic pricing model… directly correlates with the market's perceived probability of a specific event occurring," which provides for "real-time fluctuations in contract prices, ensuring that they accurately reflect the consensus opinion of the market participants."[5]

68.     As the perceived likelihood of a "Yes" outcome increases (i.e., more people have purchased the "Yes" option in an event contract), the corresponding "Yes" contract price increases and the contract price for "No" will fall. Conversely, the contract price for "No" will increase as the perceived likelihood of a "No" outcome increases, and the contract price for "Yes" will decrease.

69.     Once the event resolves, Kalshi settles contracts at $1 for the correct outcome and $0 for the incorrect one.

70.     For example, imagine a wager on 100 "Yes" event contracts for a certain event to take place, say the Pittsburgh Pirates defeating the New York Mets, at a cost of 30 cents each ($30

---

[4] https://help.kalshi.com/en/articles/13823836-how-are-prices-determined (last visited March 25, 2026).
[5] *Id.*

18

total) – plus any applicable "transaction fee." A correct wager, i.e., the Pirates beating the Mets, results in payout of $1 per contract, or $100 (netting $70). If incorrect, i.e., the Mets defeat the Pirates, the original $30 is lost.

71.    For most wagers, Kalshi charges a varying transaction fee, charging more for the most uncertain events. That is, $0.50 wagers have the greatest fees, amounting to approximately 1.75 cents per contract for 100 contracts.[6]

72.    Bettors deposit funds into their Kalshi account and use those funds to wager on event contracts. Any return on a successful wager will remain in the bettor's Kalshi account until they choose to withdraw. Kalshi charges a fee for certain deposit and withdrawal methods.

73.    Kalshi matches bettors on opposite sides of the event contract (the "Yes" and the "No") so that the combined investment from both bettors equals $1.

74.    Residents of the Commonwealth such as Plaintiff and the Classes have placed sports wagers (in the form of event contracts) on Kalshi's prediction market platform and have lost substantial sums of money as a result. Plaintiff, on behalf of himself and the Classes, now seeks to recover those lost funds from Defendants.

### *Kalshi's "Market Makers" Provide Liquidity*

75.    For Kalshi to offer event contracts successfully, it needs sufficient liquidity, which it obtains from "market makers," including Defendant Kalshi Trading LLC and the Susquehanna Defendants. Market makers assist Kalshi in setting the probability of future events by buying event contracts they consider undervalued and selling event contracts they consider overvalued. These opposing market forces drive event contract prices to an equilibrium reflecting all publicly available information (and sometimes probably improperly used non-public information). In the

---

[6] https://kalshi.com/docs/kalshi-fee-schedule.pdf (last visited March 25, 2026).

process, they ensure there is enough price movement to set the "Yes" and "No" options for wagers exactly equal to $1.00 – a requirement for forming a complete event contract. Indeed, Kalshi's own website admits that market makers play a key role in propping up its predictions market.[7]

76.     To obtain additional profits, market makers sometimes choose to favor one side of the ledger, providing liquidity to the market but taking on risk. Should the market maker wager incorrectly, the market maker risks losing its money. To minimize that risk, market makers employ dedicated research teams, proprietary statistical models, and superior data and software. These tools allow them to estimate future events with greater accuracy than any individual gambler could hope to match. Additionally, market makers benefit from their unique contractual and technological integration with prediction markets, which provide them financial benefits, reduced or no fees, differing position limits than for retail users, enhanced access through special integration with the platform and the potential for guaranteed profit by placing orders on both sides of a contract, enabling market makers to lock in gains when demand allows them to buy both Yes and No sides for a total of less than $1. These perks greatly reduce market makers' financial exposure. As a result, wagering against individual gamblers is almost all upside for them.

77.     The foregoing factors make it nearly impossible for individual gamblers to profit by gambling on Kalshi over time – even without factoring in Kalshi's "transaction fee."

78.     Market makers account for a significant portion of the total spending on Kalshi's event contracts.[8] As a result, when the Commonwealth's residents place a wager on Kalshi, there is typically a market maker on the other side of the ledger. Thus, while Kalshi is in one sense the direct counterparty to every transaction on the platform (and therefore a "winner" of gamblers'

---

[7]   https://help.kalshi.com/en/articles/13823819-how-to-become-a-market-maker-on-kalshi   (last visited March 26, 2026).

[8] https://news.kalshi.com/p/who-am-i-trading-against-on-kalshi (last visited March 26, 2026).

money), market makers also function as a counterparty. And because individual gamblers cannot match the knowledge, data analytics, and resources that market makers bring to bear, they lose expected value each time they purchase an event contract.

79.     Prediction markets and market makers need not be separate entities. A recent article confirms that "Kalshi is also doing its own market making through a separate entity called Kalshi Trading."[9] In other words, Kalshi does not merely own and operate a prediction market platform. It also drives gambling on that platform by buying and selling its own inventory. In that way, Kalshi pits itself directly against individual users (including Plaintiff and the Classes). That is one more way in which Kalshi itself is a gambling "winner."

80.     Kalshi's affiliated entity, Defendant Kalshi Trading LLC, thus fills a role similar to that of the house in a classic gambling operation, by acting as a market maker on its platform. It supplies liquidity by placing both buy and sell orders for event contracts, ensuring that bettors can wager at nearly all times. It takes opposing positions, absorbs imbalances in bettor demand, and profits from price movements. For example, suppose Kalshi offers a contract asking whether the USA will defeat Paraguay in the FIFA World Cup. A bettor might want to wager on 100 "Yes" shares at 58 cents each, expecting the USA to win. But if there are not enough other bettors willing to buy "No" shares at that price, Kalshi Trading steps in and buys the "No" shares. Kalshi Trading accounts for a substantial portion of the Kalshi platform's wagering volume.

81.     Kalshi also has an affiliated clearinghouse under common ownership called Kalshi Klear LLC that finalizes and settles event contract wagers. Kalshi Klear is responsible for determining outcomes, issuing payouts, and processing the movement of funds between bettors once an event is resolved. It functions entirely within Kalshi's corporate structure and does not

---

[9] https://www.actionnetwork.com/education/how-to-bet-on-kalshi (last visited March 26, 2026).

serve as an independent intermediary. This arrangement allows Kalshi to control each stage of the sports wager process.

82.     Kalshi's use of its own affiliated clearing agent reveals that the company is not merely providing a platform for third-party trading. It is administering a closed-loop wagering system, in which it creates the games, handles the bets, and pays out the winners.

83.     To provide added liquidity, Kalshi also partners with certain designated third-party market makers. Kalshi's own website confirms this relationship with its market makers. It acknowledges that "[m]arket maker status is granted following a thorough review of financial resources, trading experience, and business reputation; and approval is based on the ability to meet ongoing liquidity obligations while ensuring a fair and orderly marketplace."[10] And as a reward for achieving that status, market makers receive benefits from Kalshi, including financial benefits, reduced or no fees, differing position limits, and enhanced access. The general public cannot access these benefits. And they provide market makers with a decided advantage when using Kalshi's platform, ensuring that they profit at the expense of the public.

84.     These market makers include the Susquehanna Defendants, which regularly take the opposite side of users' sports wagers and regularly profit from those wagers placed by Massachusetts residents. Although nominally separate legal entities, institutional market makers such as the Susquehanna Defendants are not financially independent of Kalshi. Rather, they are Kalshi's business partners, contracting directly with Kalshi to ensure continuous wagering on the platform. In exchange, they receive numerous financial and non-financial kickbacks and benefits.

---

[10]  https://help.kalshi.com/en/articles/13823819-how-to-become-a-market-maker-on-kalshi  (last visited March 26, 2026).

Through this coordinated arrangement and material assistance, Defendants work in concert to make and promote illegal, unconstitutional, and unregulated gambling available in Massachusetts.

85.    Plaintiff and the Classes have repeatedly placed wagers on event contracts directly supported by the liquidity provided by institutional market makers (including Defendant Kalshi Trading LLC and the Susquehanna Defendants). Because the Commonwealth's residents' funds flowed to these market makers, such market makers are "winners" for purposes of the Massachusetts Statute of Anne. Plaintiff, on behalf of himself and the Classes, may therefore sue these entities to recover the money they have taken from Plaintiff and the Classes.

### *Robinhood Offers Kalshi Sports Wagers*

86.    In March 2025, Robinhood launched its prediction markets hub, through which its customers can place event contract trade orders. Since then, Robinhood has offered and facilitated event contract trading (including sports event contracts) to Massachusetts residents and intermediates many of Robinhood's users' event contract trades (including sports event contract trades) on Kalshi's platform. Robinhood has entered into agreements with Kalshi that allow it to access Kalshi's contract market facilities for this purpose. Robinhood earns substantial revenue by facilitating sports event contract trading, including by sharing in "transaction fees" at the expense of Plaintiff and the Classes.

87.    Robinhood currently facilitates all of its customers' sports-related event contract trades through Kalshi. While Robinhood customers are placing orders for sports event contract trades in their Robinhood accounts, the trades themselves are taking place on Kalshi's exchanges. This is no different from when a Kalshi customer places an order for an event contract trade through her Kalshi account, which is then executed on Kalshi's exchange. For Robinhood customers, the user interface is Robinhood's, which is convenient for Robinhood customers, but

this does not affect the way in which trades are executed on the exchanges. Robinhood, like Kalshi, thus engages in sports wagering without a license in violation of Massachusetts law.

88.    Robinhood itself recognizes its offering of Kalshi sport wagers violates Massachusetts law. In a complaint it filed in federal district court against the Commonwealth, Robinhood argued that Massachusetts' regulation of sports wagering in Massachusetts is preempted by the federal Commodities Exchange Act ("CEA"). Robinhood sought on that basis, and only that basis, to enjoin the Commonwealth from enforcing Massachusetts gambling laws against Robinhood for its facilitation of transactions with Kalshi involving sports-related event contracts, recognizing that absent such preemption its hosting of Kalshi sports contracts on its own platform violates Massachusetts law. As noted above, however, in the Massachusetts state court case against Kalshi, the Superior Court in its Preliminary Injunction Decision held that the CEA does not preempt the Massachusetts Sports Wagering Law. That issue is now before the SJC.[11]

89.    Because Robinhood hosts Kalshi's prediction market on Robinhood's own platform, Robinhood too functions as a prediction market and is liable under both under the Massachusetts Statute of Anne and for unjust enrichment.

***Defendants Offer Unlicensed Sports Wagering to Massachusetts Residents, in Violation of Massachusetts Law***

**Kalshi Engages in Sports Wagering Under Massachusetts Law**

90.    Kalshi's sports-related "event contracts" are in fact sports wagers under Massachusetts law and regulated by the MGC.

---

[11] The District Court dismissed Robinhood's complaint against the Commonwealth for lack of ripeness, because the Commonwealth stipulated it would not file any enforcement action against Robinhood while its motion for a preliminary injunction remains pending in the proceeding brought against Kalshi in the Massachusetts courts. Robinhood appealed that dismissal to the First Circuit in mid-March 2026. *Robinhood v. Campbell*, No. 25-cv-12578 (Nos. 69, 108, 110, 112).

91.    Even though Kalshi labels its offerings "event contracts," consumers are in reality placing wagers on the outcome of sporting events.

92.    Kalshi's sporting event contracts constitute "sports wagering" because Kalshi is engaged in "the business of accepting wagers on sporting events." M.G.L. c. 23N, § 3.

93.    Kalshi's offerings are "wagers" because a user risks a sum of money (i.e., the price of the contract) on an uncertain occurrence in a sporting event (i.e., the position taken on the event contract) for the chance to win money if the event takes place (i.e., a prize). *See id.*

94.    Kalshi's sporting event contracts concern "professional [and collegiate] sport or athletic event[s]," which constitutes "sporting events" *Id.*

95.    Accordingly, Kalshi's sport events contracts are wagers on uncertain outcomes, structured and operated in a way that unquestionably meets the legal definition of sports wagering under Massachusetts law.

96.    Moreover, Kalshi's wagers bear a striking resemblance to several specific wager types that are explicitly identified by Chapter 23N as sports wagering.

97.    For example, Kalshi's offerings include those which display a binary option of a winner of a sports contest, the perceived likelihood of either option winning, and a price on either option determined by that perceived likelihood.

98.    Kalshi pays out to the winner and nothing to the loser.

99.    Such bets are "moneyline wagers," which Chapter 23N, § 3 specifically identifies as one of the types of bets defined as "sports wagering."

100.    For sports wagering operators that are licensed in Massachusetts, moneyline wagers display binary options of the winner of a contest, noting odds and a higher payout for the option that is less likely to occur.

101. Another type of sports wager Kalshi offers is a point spread bet, which is a bet on the difference in score between teams in a game. Point spread bets are encompassed within the definition of sports wagering. M.G.L. c. 23N, § 3.

102. Kalshi also offers "over-under" wagers, which are bets on whether the total amount of points scored in a game is over or under a specific amount. Over-under bets are explicitly included in the definition of sports wagering. *Id.*

103. An additional type of sports wager that Kalshi offers is a proposition bet, which is a bet on specific events that are not the outcome of a game, such as whether Texas will be the first team to reach 10 points in a college basketball game against Purdue. Proposition bets are included in the definition of sports wagering. *Id.*

104. Kalshi also offers parlays, which are bets on whether a combination of different events will occur in a sporting match, such as allowing a user to select a specific football team to win a game and a specific player to score a touchdown in that game. Parlays are explicitly included in the definition of sports wagering. *Id.*

105. Furthermore, Kalshi's wagering structure, including the ability to sell wagers to other users and the matching of buyers on opposite sides of a contract, constitutes "exchange wagering," which is explicitly included in the definition of sports wagering. *Id.*

106. In addition, in the exact same manner as licensed sports wagering operator platforms, Kalshi offers users the ability to wager on sporting events while those events are taking place.

107. In sum, Kalshi unquestionably engages in sports wagering under Massachusetts law.

**Kalshi Conducts "Illegal Gaming" Under Massachusetts Law**

108.    In addition to satisfying the statutory definition of "sports wagering" under Chapter 23N, Kalshi's event contracts also fall within the statutory definition of "illegal gaming" under Massachusetts law.

109.    Kalshi's sports event contracts constitute a "percentage game" played on an electronic device (i.e., a computer or mobile device) for money. *See* M.G.L. c. 4, § 7, cl. 10.

110.    Kalshi's sports event contracts also satisfy all three elements of illegal gaming (generally referred to as an illegal lottery) under Massachusetts law: prize, consideration, and chance. *See, e.g.*, *Commonwealth v. Stewart-Johnson*, 78 Mass. App. Ct. 592, 594 (2011). Kalshi's users stake money (consideration) to purchase binary contracts with the hope of receiving a monetary return (a prize) if they correctly predict the outcome (chance) of a future sports event. Chance predominates over skill in determining the outcome of these sports contracts. While users may conduct research or follow trends, they cannot influence or control the actual result of a sporting event. The event turns on external, uncertain factors, such as player performance, officiating, weather, and injuries. These factors are entirely unknowable and beyond the bettor's control. As a result, Kalshi's sports event contracts constitute illegal gaming under Massachusetts law.

111.    Massachusetts is not alone in determining that Kalshi is engaged in illegal gaming. Multiple state gambling regulators have issued cease-and-desist orders to, commenced litigation, and/or obtained preliminary injunctions against Kalshi for offering unlicensed sports wagering.

**Defendants' Offering of Illegal Sports Wagers Violates the Statute of Anne, Constitutes Unjust Enrichment, and Violates M.G.L. c. 93A**

112.    In light of the foregoing, Kalshi's offering of sports wagers without a license is plainly illegal under Massachusetts law. As noted above, the Massachusetts Statute of Anne provides that "[w]hoever, by playing at cards, dice or other game, ... except for gaming conducted

in licensed gaming establishments pursuant to chapter 23K or sports wagering conducted pursuant to chapter 23N, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner ... may recover such money or the value of such goods." M.G.L. c. 137, § 1. Massachusetts exempts from the Statute of Anne only "gaming conducted in licensed gaming establishments pursuant to chapter 23K or sports wagering conducted pursuant to chapter 23N." *Id.* And Chapter 23K, along with Chapter 23N and accompanying regulations, sets out a comprehensive regulatory scheme under which all companies offering gambling products, including sports wagering, must register with, and secure the approval of, the MGC. Presently, the Commonwealth licenses ten sports wagering operators. But Kalshi is not on that list of licensed establishments, even though it offers substantively identical gambling products to the sports wagering operators that the Commonwealth carefully regulates, such as DraftKings and FanDuel.

113.    Defendant Kalshi Klear Inc. and Defendant Kalshi Klear LLC are an integral part of the enterprise that operates and monetizes the Kalshi platform. Through clearing, settlement, and payout functions integral to completing wagers and distributing winnings and losses, Kalshi Klear performs core operational work by which the unlawful wagers are conducted. In concert with other Kalshi entities, Kalshi Klear operates a prediction market, allowing the Commonwealth's residents to place illegal, unregulated wagers in the form of event contracts.

114.    As set forth above, Defendant market makers Kalshi Trading LLC and the Susquehanna Defendants are also an integral part of the illegal gambling scheme.

115.    Because Kalshi's sports-related "event contracts" are in fact sports wagers under Massachusetts law and regulated by the MGC, Robinhood's offering and facilitation of Kalshi's sports event contracts through its own platform also violates Massachusetts law.

116.    By offering unlicensed sports wagering to Massachusetts residents, and through the other conduct described herein, Defendants have engaged, and continue to engage, in unfair and/or

28

deceptive acts or practices in the conduct of trade or commerce in violation of Chapter 93A, Section 2. Kalshi's operation of a sports wagering business without a license under the guise of a "prediction market," is both deceptive and unfair, including because it lacks any of the safeguards for responsible gambling required by Massachusetts law.

117.    Because Kalshi's sports contracts are illegal, unregulated gambling products and because Defendants are the "winners" of gambling competitions played by the Commonwealth's residents (or owners of gambling houses), Plaintiff and the Classes may sue for the uncollected losses Defendants have inflicted on them.

**<u>Kalshi Admits It Engages in Sports Wagering</u>**

118.    Kalshi advertises to Massachusetts consumers through its website and mobile apps, in addition to advertising on streaming videos and television (especially during surrounding sports broadcasts), and advertising through social media.

119.    Until recently, Kalshi explicitly marketed itself to consumers as a sports-betting platform. For example, on social media and in paid advertisements, Kalshi advertised itself as "The First Nationwide Legal Sports Betting Platform," and proclaimed that "You can now bet on sports in all 50 states with Kalshi."[12]

---

[12]  https://closingline.substack.com/p/the-takeaway-nothing-is-gambling (last visited March 26, 2026);
https://www.google.com/imgres?q=sports%20betting%20legal%20in%20all%2050%20states%20with%20kalshi&imgurl=https%3A%2F%2Fmedia.licdn.com%2Fdms%2Fimage%2Fv2%2FD5622AQFBcTXa95COqg%2Ffeedshare-shrink_800%2FB56ZTrl.cyGUAg-%2F0%2F1739119389592%3Fe%3D2147483647%26v%3Dbeta%26t%3Dr6m7jTotgItCrJNsw8mHdfgHpEmsVDeqET9CoREXi_k&imgrefurl=https%3A%2F%2Fwww.linkedin.com%2Fposts%2Fdustin-gouker-876857b5_on-the-morning-of-the-super-bowl-kalshi-activity-7294395418157752320-eAPA&docid=_5NxDV4vGPTJRM&tbnid=nBd8dt7m-HjH_M&vet=12ahUKEwiZ2aiE2L2TAxXTMlkFHYh0MXgQnPAOegQIHhAB..i&w=800&h=1186&hcb=2&ved=2ahUKEwiZ2aiE2L2TAxXTMlkFHYh0MXgQnPAOegQIHhAB (last visited March 26, 2026);
https://www.google.com/imgres?q=kalshi%20trade%20the%20headlines%20you%20can%20no



w%20bet%20on%20sports%20in%20all%2050%20states%20with%20kalshi&imgurl=https%3
A%2F%2Fmedia.eaglewebservices.com%2Fpublic%2F2026%2F3%2F1772829738340.png&im
grefurl=https%3A%2F%2Fjcpost.com%2Fposts%2F1f1ccd3f-6d1b-4a71-95fc-
0f33b0d71826&docid=u-
rAgpCVtX5fgM&tbnid=wyLcTFb2v8j3UM&vet=12ahUKEwicjb3I2L2TAxUaz_ACHV2UOk
wQnPAOegQIEhAB..i&w=2130&h=1138&hcb=2&itg=1&ved=2ahUKEwicjb3I2L2TAxUaz_A
CHV2UOkwQnPAOegQIEhAB     (last     visited     March     26,     2026);
https://www.google.com/imgres?q=kalshi%20bet%20on%20the%20nfl%20legal%20in%2050%
20states&imgurl=https%3A%2F%2Fsubstackcdn.com%2Fimage%2Ffetch%2F%24s_!OF0i!%2
Cf_auto%2Cq_auto%3Agood%2Cfl_progressive%3Asteep%2Fhttps%253A%252F%252Fsubsta
ck-post-media.s3.amazonaws.com%252Fpublic%252Fimages%252Fe7e38890-6cd2-40c7-aab8-
38d0c3f990c5_1179x1941.jpeg&imgrefurl=https%3A%2F%2Fnexteventhorizon.substack.com
%2Fp%2Fyes-kalshi-is-still-marketing-itself-as-
betting&docid=S0Y2YipLElREOM&tbnid=f2At7ebNDmK7IM&vet=12ahUKEwiNnMHc2b2T
AxUXnokEHYiNA78QnPAOegQIGRAB..i&w=1179&h=1941&hcb=2&ved=2ahUKEwiNnM
Hc2b2TAxUXnokEHYiNA78QnPAOegQIGRAB (last visited March 26, 2026).





120.   At least some if not all of Kalshi's advertisements in which it marketed itself to consumers as a legal sports-betting platform were directed to and/or seen by residents of Massachusetts. Kalshi's advertisements had the capacity to mislead Massachusetts consumers acting reasonably under the circumstances, and did in fact mislead Plaintiff and members of the Classes, to make sports wagers on the Kalshi and/or Robinhood platforms when they otherwise would not have done so.

121.   While Kalshi may no longer publicly state that it operates "The First Nationwide Legal Sports Betting Platform" or that "You can now bet on sports in all 50 states with Kalshi," it has never changed its underlying business model or wagering mechanics. As a result, Kalshi continues to offer its sports wagering, which is illegal in Massachusetts.

### Kalshi's Platform Lacks Required Safeguards for Responsible Gambling, yet Emulates a Gambling Platform

122.   Massachusetts law limits gambling to those residents of the Commonwealth ages 21 and older. *See* M.G.L. c. 23K, § 43. But anyone 18 years of age or older can use Kalshi's platform to place illegal, unregulated bets.

123.   As the Massachusetts Attorney General has observed in its litigation against Kalshi, Kalshi also provides few if any safeguards to educate users about financial responsibility, risks of losing money, and has only implemented minimal responsible gambling tools mandated of licensed sports wagering operators to address addiction.

124.   As the Massachusetts Attorney General has further recognized, Kalshi does not provide any resources or information to a bettor who is seeking responsible gambling messaging or help for financial loss or gambling addiction, such as the Massachusetts Problem Gambling Helpline or have programs that intervene to promote responsible gambling when a bettor's pattern of wagering indicates potential problem gambling behavior.

125.    At the time it launched its sports event contracts, Kalshi did not provide any self-limiting options to Massachusetts bettors such as maximum deposits, maximum wagers for a particular contract, or the maximum wager on a particular position over a particular time span. While it now purports to offer a "Voluntary Self-Exclusion," as well a new initiative called SelfExclude as of April 2026, in which users put themselves on a list to exclude themselves from multiple leading exchange-betting apps, including Kalshi, Kalshi admits that these self-exclusions do not limit a trader's ability to access Kalshi products via a Futures Commission Merchant. "It is ultimately the trader's responsibility not to trade during this time."[13] As a result, users, including Plaintiff and Class members, can still access Kalshi's sports wagers through platforms such as Robinhood.

126.    In sum, Kalshi's platform lacks many of the safeguards required for responsible gambling under Massachusetts law.

127.    At the same time, however, as the Massachusetts Attorney General recognized in its Superior Court Complaint against Kalshi, Kalshi's platform mirrors gambling platforms.

128.    Kalshi's platform employs various behavioral design mechanisms drawn from gambling psychology, including features that encourage impulsive engagement, exploit award anticipation, and diminish users' perceptions of financial risk, such as an "Ideas" tabs where users can post predictions and interact with one another, a "Leaderboard" to rank bettors based on profits, volume, and predictions, and associated "countdown" clocks.

129.    Kalshi's uninterrupted sequence of feedback and engagement contributes to a reward loop commonly associated with addictive gambling behavior. Behavioral researchers warn that such mechanisms, modeled after operant conditioning and slot machine dynamics, can bypass

---

[13] https://help.kalshi.com/en/articles/13823789-voluntary-self-exclusion (last visited April 16, 2026).

rational evaluation and contribute to excessive financial risk-taking.

130.    Although Kalshi makes its contract wagers freely accessible to the public in Massachusetts through its website and its mobile apps, and operates a platform that emulates digital sports gambling platforms, Defendants do not even attempt to comply with Massachusetts' sports wagering laws designed to protect Massachusetts residents.

**Kalshi Causes Plaintiff and the Classes to Suffer Substantial Gambling Losses**

131.    Kalshi has rapidly become one of the largest gambling platforms in the United States. It has traded over $1 billion in sports contracts, operating in all 50 states, with over five million users nationwide. Many of those five million individuals, including Plaintiff and the Classes, reside within the Commonwealth.

132.    Moreover, the individual bets placed on Kalshi are often significant. Plaintiff, for example, lost tens of thousands of dollars wagering on sports contracts through Kalshi in a one-month period in late January and February 2026.

133.    Kalshi's conduct is fueling widespread gambling addiction. Prediction markets such as Kalshi's blur the line between betting and other financial activities, and the ability to place one bet after another on platforms such as Kalshi's encourages loss chasing, i.e., continuing to bet when deep in the red, which is a hallmark behavior of those with gambling problems.

134.    Problem gambling is especially common among young sports bettors. Per one industry study, some 58% of 18- to 22-year-olds gamble on sports, "with 16% having engaged in at least one risky behavior and 6% reporting that they have previously lost more than $500 on sports betting in a single day."[14] Sports gambling addictions can begin as early as age ten, and

---

[14]    https://www.ncaa.org/news/2023/5/24/media-center-ncaa-releases-sports-wagering-survey-data.aspx#:~:text=This%20is%20a%20higher%20rate,will%20increase%20their%20monetary%20earnings (last visited March 26, 2026).

studies have found that between 4% and 8% of youths suffer from problem gambling.[15] Those addictions can prove financially ruinous and take a severe emotional toll.

135.    Sports gambling has serious public health risks that may lead to harm to a gambler's financial, economic, emotional, and physical well-being, as well as the well-being of their families and communities.

136.    "[N]ot only does sports betting lead to increased betting activity, but it also leads to higher credit card balances, reduced available credit, decreased net investments in financial markets, and greater participation in lottery play. These effects are particularly pronounced among financially constrained households."[16]

137.    Several U.S. studies report that those with gambling disorder had the highest suicide rate of any addiction disorder, with one in five having attempted suicide.[17]

138.    Approximately two million adults in the U.S. (1% of the population) and over 139,600 individuals (2%) in Massachusetts experience gambling problems, with another 4-6 million Americans (2-3%) demonstrating problematic gambling behaviors.[18]

139.    Kalshi is facilitating gambling in Massachusetts without all required responsible gambling features mandated for licensed sports wagering operations, and without any oversight by the MGC as to whether its measures are effective, which is exposing residents of the Commonwealth to gambling addiction with few safeguards.

---

[15] https://www.mass.gov/info-details/teens-gambling-its-a-risk#:~:text=Gambling%20disorders%20can%20begin%20in,with%20simple%20activities%20such%20as: (last visited March 26, 2026).

[16] https://www.cnbc.com/2024/08/21/the-explosion-of-online-sports-betting-is-taking-a-toll-on-how-people-invest.html (last visited March 26, 2026).

[17] https://pmc.ncbi.nlm.nih.gov/articles/PMC9983450/ (last visited March 26, 2026).

[18] https://macgh.org/gambling-problems/#:~:text=If%20this%20sounds%20like%20you,that%20put%20them%20at%20risk (last visited March 26, 2026).

Class Action Allegations

140.    Plaintiff brings this action on his own behalf and as a class action pursuant to Massachusetts Rule of Civil Procedure 23, M.G.L. c. 93A, §9(2), and Federal Rule of Civil Procedure 23 on behalf of a class (the "Kalshi Class") consisting of:

> All persons who, while located in Massachusetts, paid money placing sports wagers with Kalshi.

Plaintiff also brings this action on behalf of a subclass (the "Robinhood Subclass") consisting of:

> All persons who, while located in Massachusetts, paid money placing sports wagers with Kalshi using Robinhood's platform.

Together, the Kalshi Class and Robinhood Subclass are referred to as the "Classes." Excluded from the Classes are Defendants, as well as any affiliated companies of Defendants and their current and former directors, officers and employees and any Judge presiding over this action and members of their families.

141.    This action is properly maintainable as a class action under Massachusetts Rule of Civil Procedure 23, M.G.L. c. 93A, §9(2), and Federal Rule of Civil Procedure 23.

142.    The Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class members its unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, there are likely at least thousands of members of the Classes.

143.    There are many questions of law and fact which are common to the Classes and which predominate over questions affecting any individual Class member. The common questions include, without limitation, the following:

(a)    whether Defendants have violated the Massachusetts gambling laws, including without limitation M.G.L. c. 23N and the regulations promulgated thereunder, M.G.L. c. 137, §§ 1 and 2 and M.G.L. c. 271;

(b)      whether Plaintiff and each member of the Classes lost money or anything of value on Kalshi;

(c)      whether Defendants have been unjustly enriched as a result of their conduct;

(d)      whether Defendants' conduct alleged herein constitute unfair and/or deceptive acts or practices in the conduct of trade or commerce in violation of M.G.L., Chapter 93A, §2; and

(e)      whether Defendants willfully and knowingly violated M.G.L., Chapter 93A, §2.

144.    Plaintiff's claims are typical of the claims of the other members of the Classes, and Plaintiff does not have any interests adverse to the Classes.

145.    Plaintiff is an adequate representative of the Classes, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Classes.

146.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which could establish incompatible standards of conduct for the party opposing the Classes.

147.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

148.    Defendants have acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making the relief sought appropriate with respect to the Classes as a whole.

149.    Plaintiff reserves the right to revise the foregoing Class Action Allegations, including the proposed Class Definition, based on facts learned through additional investigation and in discovery.

## COUNT I

(Violation of M.G.L. c. 137 Against All Defendants)
(On behalf of Plaintiff and the Classes)

150.    Plaintiff repeats and realleges each allegation set forth herein.

151.    Section 1 of Chapter 137 of the Massachusetts General Laws provides, in relevant part, as follows:

> Whoever, by playing at cards, dice or other game, or by betting on the sides or hands of those gaming, except for gaming conducted in licensed gaming establishments pursuant to chapter 23K or sports wagering conducted pursuant to chapter 23N, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, or whoever pays or delivers money or other thing of value to another person for or in consideration of… [an]other bet, may recover such money or the value of such goods in contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof.

152.    Section 2 of Chapter 137 of the Massachusetts General Laws provides, in relevant part, as follows:

> The owner… of a house…, but not including an owner or operator of a gaming establishment licensed… where money or goods are lost, paid or delivered in any form of gaming referred to in the preceding section, or by betting on the sides or hands of those gaming, with the knowledge or consent of said owner… shall be liable in the same manner and to the same extent as the winner or receiver thereof is liable under the preceding section.

153.    Plaintiff and the Classes deposited money into accounts created and owned by Defendants for the purpose of engaging in unlawful betting/wagering, which they lost.

39

154.    Defendants were engaged in an unlicensed, unlawful enterprise wherein consumers such as Plaintiff and the Classes paid to participate in unlawful betting/wagering.

155.    Pursuant to M.G.L. c. 137, §§ 1 and 2, Plaintiff and the Classes have a right to recover from Defendants, as a "winner" under section 1 and/or as the owner of an unlicensed gaming establishment with knowledge and consent under section 2, the monies that Plaintiff and the Classes deposited and lost as part of Defendants' unlawful betting/wagering enterprise.

## COUNT II

(Unjust Enrichment Against All Defendants)
(On behalf of Plaintiff and the Classes)

156.    Plaintiffs repeat and reallege each allegation set forth herein.

157.    Plaintiff and the Classes conferred benefits on Defendants by paying Defendants to participate in their unlawful betting and wagering scheme.

158.    Defendants knew that Plaintiff and the Classes conferred a benefit upon them, which Defendants accepted.

159.    Defendants unjustly enriched themselves by saving the costs they reasonably should have expended on complying with regulations and tax requirements for offering betting and wagering services that were not permitted by law.

160.    Under principles of equity and good conscience, Defendants should not be permitted to retain the value of the benefits that Plaintiff and the Classes conferred upon Defendants.

161.    Plaintiff and Class members have no adequate remedy at law.

162.    Defendants should be compelled to disgorge into a common fund – for the benefit of Plaintiff and the Classes – all unlawful or inequitable proceeds they have received because of their misconduct.

## COUNT III

(Violation of M.G.L. c. 93A Against All Defendants)
(On behalf of Plaintiff and the Classes)

163.    Plaintiff repeats and realleges each allegation set forth herein.

164.    At all relevant times, Defendants were engaged in trade or commerce within the Commonwealth of Massachusetts, including offering unlicensed sports wagering to Massachusetts residents through Kalshi's platform and the offering of Kalshi's products through Robinhood's platform.

165.    By offering unlicensed sports wagering to Massachusetts residents, and through the other conduct described above, Defendants have engaged in unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Chapter 93A, Section 2. Kalshi's operation of a sports wagering business without a license under the guise of a "prediction market," is both deceptive and unfair, including because it lacks any of the safeguards for responsible gambling required by Massachusetts law.

166.    In addition, by advertising its unlicensed sports wagering to Massachusetts residents as legal sports wagering, in combination with the other conduct described above, Kalshi has engaged in unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Chapter 93A, Section 2.

167.    Kalshi engaged in advertising methods that rendered its advertisements false and misleading, such that Plaintiff and the Classes would not have engaged in sports wagering on Kalshi's platform had they known that Kalshi's operation of a sports wagering business without a license under the guise of a "prediction market" violates Massachusetts' gambling laws.

168.    Kalshi's advertisements had the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted, including by enticing a reasonable consumer to purchase a product. Representations are deceptive

if, when looked at as a whole, they are misleading, even if individual portions contain factually true statements.

169.   Kalshi's advertisements in which it marketed itself to consumers as a legal sports-betting platform had the capacity to mislead consumers, and did in fact mislead Plaintiff and the Classes, to place sports wagers on Kalshi's platform that they otherwise would not have placed.

170.   The violations of Chapter 93A by Defendants as described herein were done willfully, knowingly, and in bad faith. Kalshi knowingly proceeded in Massachusetts and other states that require sports wagering entities to be licensed, even after the CFTC warned it to be cautious in light of ongoing state enforcement efforts.

171.   As a direct and proximate result of Defendants' conduct, Plaintiff and the members of the Classes were harmed, including without limitation because they suffered gambling losses on Kalshi and Robinhood that they would not have incurred but for Defendants' operation of an unlicensed sports wagering platform.

172.   On or around April 15, 2026 and April 17, 2026, Plaintiff sent Defendants written demands for relief pursuant to Chapter 93A, Section 9, identifying the claimant and reasonably describing the unfair acts or practices relied upon and the injuries suffered. None of the Defendants responded to those demands. Defendants thus did not make a reasonable offer of relief for the unfair and deceptive acts Plaintiff described in his demand letters.

173.   As a result of Defendants' violation of Chapter 93A, § 2, Defendants are liable to Plaintiff and the Classes for the damages that Plaintiff and the Classes incurred, or the statutory minimum damages, whichever is greater.

174.   As a result of Defendants' willful and knowing violation of Chapter 93A, §2, Defendants are liable to Plaintiff and the Classes for up to three times the damages that Plaintiff and the Classes incurred or the statutory minimum damages, whichever is greater.

175.     As a result of Defendants' failure to make a reasonable offer of settlement in response to Plaintiff's written pre-suit demand for relief, Defendants are liable to Plaintiff and the Classes for up to three times the damages that Plaintiff and the Classes incurred or the statutory minimum damages, whichever is greater.

176.     Defendants are also liable to the Plaintiff for all related court costs, attorneys' fees, and interest.

<u>Prayer for Relief</u>

WHEREFORE, Plaintiff, on behalf of himself and the other Class members, requests that the Court enter judgment against Defendants as follows:

A.      Declaring that this is a properly maintainable class action under Massachusetts Rule of Civil Procedure 23, M.G.L. c. 93A, §9, and/or Federal Rule of Civil Procedure 23 and declaring Plaintiff to be a proper Class representative;

B.      Declaring that Defendants' conduct, as set forth above, violates the Massachusetts gambling laws, M.G.L. c. 93A, §2, and constitutes unjust enrichment;

C.      Enjoining Defendants from continuing the challenged conduct;

D.      Awarding damages to Plaintiff in the Classes in an amount to be determined at trial, but which amount will include without limitation the amount of the losses suffered by Plaintiff and the Classes and disgorgement of Kalshi's transaction fees, deposit and withdrawal fees and profits;

E.      Awarding Plaintiffs double or treble damages on behalf of Count III because Defendants' M.G.L. c 93A, §2 violations were made willfully and knowingly;

F.      Awarding Plaintiffs' counsel reasonable attorney's fees and expenses;

G.      Awarding pre- and post-judgment interest; and

H.      Granting such other and further relief as this Court may deem just and proper.

43

<u>Jury Trial Demand</u>

Plaintiff hereby demands trial by jury on all issues so triable.


DATED:  June 19, 2026

By their attorneys,


*/s/ Ian J. McLoughlin*
Edward F. Haber (BBO # 215620)
Ian J. McLoughlin (BBO #647203)
Shapiro Haber & Urmy LLP
One Boston Place, 26th Floor
Boston, MA 02108
Telephone: (617) 439-3939
Fax: (617) 439-0134
ehaber@shulaw.com
imcloughlin@shulaw.com

PUBLIC HEALTH ADVOCACY INSTITUTE
Andrew Rainer (BBO #542067)
Jacob B. Wolk (BBO #699263)
Mark Gottlieb (BBO #627008)
Amy Pearlman (BBO #704152)
360 Huntington Avenue, CU117
Boston, MA 02115
(617) 373-2026
arainer@phaionline.org
jacobwolk@phaionline.org
mark@phaionline.org
apearlman@phaionline.org


## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.


*/s/ Ian J. McLoughlin*
Ian J. McLoughlin

44